## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 25-CR-134 (RC)** |
| | : | |
| **RYAN MICHAEL ENGLISH,** | : | |
| Also known as "Riley Jane English," | : | |
| | : | |
| **Defendant.** | : | |

## <u>GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE</u>

The Government opposes the Motion for Release of Ryan Michael English (hereinafter, the "Defendant"). Previously the defendant had conceded detention. The Defendant now cites "new circumstances" as a basis for a renewed motion for release. The primary relevant new circumstance of which the Government is aware is that the Defendant has been indicted by a federal grand jury with a violation of 18 U.S.C. Section 351(c) for an attempt to assassinate the nominee to head the Department of Treasury during the pendency of his nomination, as well as a violation of 40 U.S.C. § 5140(e)(1)(A)(i) for possession of a dangerous weapon on the Grounds of the United States Capitol.

The criminal conduct for which the Defendant is before the Court was not a momentary lapse in judgment; rather, it was a premeditated and calculated attempt to commit violence in order to, in the Defendant's own words, "depose" the United States' political offices and "send a message." The Defendant was arrested just outside of the United States Capitol Building on the day of the victim's Senate confirmation hearing. However, the Defendant had started preparing to assassinate an individual associated with the incoming presidential administration approximately a month earlier by purchasing an atlas with cash to facilitate travel to Washington, D.C. without digital devices that could be tracked by law enforcement. Then, the day before the Defendant's

arrest, the Defendant had driven from their home in Massachusetts to Washington, D.C., with the intent to assassinate someone upon reaching their destination. Defendant made the conscious decision to leave electronic devices behind during the trip to avoid surveillance and detection by law enforcement. The trip was long enough that Defendant stopped and rested overnight at a rest stop. Along the way, the Defendant purchased bottles of vodka to create Molotov Cocktails to be used during the assassination attempt. During the trip, the Defendant settled on an ultimate target: the nominee for Secretary of the Treasury.

The Defendant explained their plan to officers – to either throw the Molotov Cocktails at the feet of the nominee for Secretary of the Treasury, or otherwise stab him to death using a knife carried on the Defendant's person. When the Defendant arrived at the United States Capitol (on foot and without a phone so law enforcement could not track the Defendant's location), the Defendant spent around an hour surveilling the Capitol to determine the level of security and any possible entrance points. Realizing the level of security present, the Defendant acknowledged that it would be necessary to kill "at least" three United States Capitol Police officers to get close enough to the intended victim.

In a confession to Capitol Police, the Defendant recognized such actions would put the Defendant in grave danger as well, and expressed acceptance of the likelihood of committing "suicide by cop" in the process. The Defendant discussed a recent diagnosis with a terminal illness and "wanted to do something before I go."

Ultimately, the Defendant surrendered to law enforcement – but only after having gathered weapons to commit the crime, arriving at the United States Capitol, surveilling the area, and determining that the attempted assassination would not likely succeed. When asked by officers if the devices recovered were really Molotov Cocktails, the Defendant responded, ins sum and

substance, "well, it works."

The Defendant's relevant conduct here – an attempt to assassinate the nominee for head of an executive department by burning him to death or stabbing him to death – clearly demonstrates the Defendant's danger to the community. Indeed, given the charges, there is a statutory rebuttable presumption that no condition or combination of conditions can reasonably assure the safety of the community pursuant to 18 U.S.C. § 3142(e)(3)(C) (because 18 U.S.C. § 351(c) is "an offense listed in Section 2332b(g)(5)(B) of title 18, United States Code"). Yet even without the presumption, the Defendant's illegal conduct is so shocking and dangerous that, pursuant to the 18 U.S.C. § 3142(g) factors analyzed below, no conditions or combination of conditions short of detention will ensure the safety of the community. For the reasons set forth below, as well as in its previously filed Memorandum in Support of Pretrial Detention (ECF No. 8), the Court should continue to detain the Defendant pending trial.

The Government also notes that the Pretrial Services Agency for the District of Columbia has also recommended in the Pretrial Services Report that no condition or combination of conditions can reasonably assure the defendant's appearance or safety to the community.

## **PROCEDURAL POSTURE**

On January 28, 2025, the Defendant was charged by Complaint with Unlawful Receipt, Possession, and/or Transfer of a Firearm, in violation of 26 U.S.C § 5861, and Carrying a Firearm, Dangerous Weapon, Explosive, or Incendiary Device on the Grounds of the U.S. Capitol, in violation of 40 U.S.C. § 5104(e)(1)(A).

During the Defendant's Initial Appearance, the Government moved for the Defendant's pretrial detention under 18 U.S.C. § 3142(f)(1)(E) (Felony Involving a Destructive Device).

The Defendant submitted a Motion for Release from Custody (ECF No. 7). The

Government submitted a Memorandum in Support of Pretrial Detention (ECF No. 8).

Ultimately, at a detention hearing on January 30, 2025, the Defendant conceded detention.

On March 8, 2025, a federal grand jury in the District of Columbia returned a two count indictment charging the Defendant with the attempt to assassinate a Cabinet Member Nominee in violation of 18 U.S.C. Section 351(c) and Carrying a Firearm, Dangerous Weapon, Explosive, or Incendiary Device on the Grounds of the Capitol in violation of 40 U.S.C. § 5140(e)(1)(A)(i) (ECF No. 16).

On June 26, 2025, the Defendant filed a new Motion for Release from Custody (ECF No. 18).

## I.    <u>Legal Authority and Argument</u>

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required and the safety of any other person and the community," the Court shall order a defendant held pending trial. 18 U.S.C. § 3142(e).

The Act provides, however, for certain crimes, that there is a rebuttable presumption that no conditions or combinations of conditions will assure the safety of the community. *See id.* As is relevant to this case, the Act provides rebuttable presumptions for cases where there is probable cause to believe the defendant attempted to assassinate a person nominated to be head of a department of the executive branch of the Government in violation of 18 U.S.C. § 351. *Id.* § 3142(e)(3)(C). Here, a federal grand jury has now found probable cause to believe that the Defendant violated 18 U.S.C. § 351, which provides that: "Whoever attempts to kill any individual designated in subsection (a) of this section shall be punished by imprisonment for any term of years or for life." 18 U.S.C. § 351(c). Individuals designated in subsection (a) include "a member of the executive branch of the Government who is the head, or a person nominated to be head

4

during the pendency of such nomination, of a department listed in section 101 of title 5". 18 U.S.C. § 351(a). The nominee for Secretary of the Treasury Department qualifies as an individual under subsection (a). Additionally, the Defendant admitted that the Defendant arrived at the U.S. Capitol with a homemade incendiary device with the intent to kill the nominee for Secretary of the Treasury Department.

In determining whether any condition or combinations of conditions will assure the safety of the community, in light of any applicable presumptions, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).

In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted and the government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986). *See also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues. *See Smith*, 79 F.3d at 1210, *see Williams*, 798 F. Supp. at 36.

Because a federal grand jury has found that the Defendant violated 18 U.S.C. § 351, the Court must presume that no condition or combination of conditions will reasonably assure the safety of the community. A review of the 3142(g) factors makes clear that the defense cannot

overcome these presumptions.

### A.  <u>Nature and Circumstances of the Offense Charged</u>

The nature and circumstances of the offenses charged weigh heavily in favor of detention. The Defendant planned and took a number of substantial and significant steps to kill multiple members of the new presidential administration.   This was not a spur-of-the-moment decision. The Defendant planned the attack well in advance and then took multiple concrete steps to effectuate this plan.   The Defendant traveled from Massachusetts to Washington, D.C. to "send a message" to the new presidential administration.

*Late December 2024 – Mid January 2025*

During a custodial interview with law enforcement officers on January 27, 2025, the Defendant admitted to planning this trip to Washington, D.C. about one month prior.   The Defendant bought an atlas with cash, to avoid any tracing of the transaction. When the Defendant went to purchase the atlas, the Defendant also wore clothes to conceal the Defendant's appearance and left any cell phone at home to avoid surveillance. The Defendant purchased the atlas to navigate to Washington, D.C., given that the Defendant planned to not have a phone with GPS capability.   A photo of the atlas found in the Defendant's car is depicted below.



*A photo of an atlas recovered from the Defendant's vehicle*

<u>January 26, 2025</u>

As stated to law enforcement officers in the custodial interview, on January 27, 2025, the Defendant left Massachusetts, where the Defendant resides, to travel to Washington, D.C.  As planned, the Defendant purposefully left a mobile phone at home in Massachusetts so that the Defendant's travel and whereabouts could not be surveilled. The Defendant then traveled to Washington, D.C., with the intention of killing the "Nazi" Secretary of Defense, and/or the Speaker of the House, and/or burning down a think tank based in Washington, D.C. that is located "two blocks from the White House." The Defendant explained that these actions were specifically to "depose" these political offices and send a message.   On the evening of January 26, the Defendant stayed overnight at a rest stop somewhere in New Jersey.

On the Defendant's way to Washington, D.C., the Defendant stopped at a library in Chevy

Chase, Maryland, observed Reddit posts mentioning the confirmation hearings of the Secretary of the Treasury, and altered the Defendant's target.

The Defendant also purchased alcohol bottles on the way to Washington, D.C. for the intended purpose of constructing a destructive device. Originally, the Defendant's thoughts were to use the small bottles of vodka to start fires.   Later, the Defendant's plan was to wrap the bottles in rags soaked in alcohol, light the rags, and throw the devices at the victim's feet.

*January 27, 2025*

On Monday, January 27, 2025, at approximately 1:57 PM, the Defendant arrived on the U.S. Capitol Grounds.   From 1:57 PM until approximately 3:12 PM, the Defendant walked loops around the grounds of the U.S. Capitol, scouting and surveilling the grounds. According to the Defendant's statements during the custodial interview, the Defendant surmised that the Defendant would have to kill, "at least," three U.S. Capitol Police Officers to get to the nominee and kill him. The Defendant recognized that these actions were likely to put the Defendant in grave danger and expressed acceptance and content with the possibility of suicide by cop.

The Defendant now seeks to downplay such conduct by describing it as "pacing back and forth in and around the Capitol building" (ECF No. 18 at 5).   However, the Defendant clearly stated during an interview with law enforcement that such "pacing" was an attempt for over an hour to surveil the Capitol to determine the level of security and any possible entrance points to commit the assassination. It was only after failing to identify a vulnerable point in the security and feeling that law enforcement would have already noticed such suspicious behavior that the Defendant ultimately surrendered to law enforcement.

At approximately 3:12 PM, at 1 First Street NW, near the South Door of the U.S. Capitol Building, the Defendant approached a Capitol Police Officer (hereinafter "CPO-1") and stated "I'd

like to turn myself in." The Defendant further admitted to being in possession of multiple knives and what the Defendant referred to as two "Molotov Cocktails".

The Defendant was detained and searched by CPO-1 and another Capitol Police Officer (CPO-2). While being searched, the Defendant stated "I've got a knife in my pocket, and Molotovs in my jacket." The search of the Defendant uncovered a folding knife in the front right pants' pocket, as well as two destructive devices from the inside pockets of a jacket. The destructive devices were constructed of 50 milliliter bottles of Absolut brand vodka with a grey cloth affixed to its top. A green BIC brand lighter was also recovered from the Defendant's pants' pocket. Defendant also admitted to bringing a larger bottle of vodka to create an even more dangerous Molotov Cocktail but left it behind out of fear that the larger bottle would be more easily detected.

While being searched, the Defendant stated that the bottle contained "Vodka, hand sanitizer on the rag, and a lighter."   While the Defendant now attempts to argue that the "items would never have caused damage." (ECF No. 18 at 6).   But, when asked, "Is that really a Molotov cocktail?", the Defendant responded, "Well, it works."   Shortly thereafter, the Defendant declared that they had gone to the Capitol that day to kill the nominee:

> Q.    What are you doing here today?
> A.    I was going to kill Scott Bessent.
> Q.    Kill Scott Bessent?
> A.    Yes, sir.

The Defendant's car was located in the 900 Block of Independence Ave SW. A law enforcement officer asked whether the Defendant left anything on the ground when walking from the car to the U.S. Capitol. The Defendant responded, "No. I don't want to hurt anyone . . . I don't want to hurt people. That's why I turned myself in." Law enforcement officers searched the Defendant's car for additional destructive devices. The search uncovered a 750 milliliter bottle of Smirnoff 100 proof vodka and a grey sweatshirt with cloth cut from the sleeves. The cloth of this

sweatshirt was consistent with the cloth affixed to the destructive devices. In the initial moments after arrest, the Defendant remarked that they had left the larger bottle of vodka in their car because it "looked dumb in my jacket, so I got the smaller ones."

During a search of the Defendant's person prior to transport, law enforcement officers recovered a receipt in the Defendant's back left pants' pocket.   On the back of the receipt was written:



*A photo of a hand-written note found in Defendant's pocket*

Additionally, as depicted below, the words "NO FUTURE NO CHOICE" were hand-written on the Defendant's arm.



*A photo of the Defendant's arms*

During the custodial interview on January 27, the Defendant discussed why they had travelled to Washington, D.C.  The Defendant told officers "pretty much the words on my arms say everything."  The Defendant also informed officers about a congenital heart defect, and saying they only had four months to live.  Regarding intent and plans for traveling to Washington, D.C. that day, the Defendant told officers:

- "I'd been thinking about this for a while, not this specifically I'd just been thinking about doing good and being good."

- "I didn't have a plan when I came down here. I've been wanting to devote my life… I've always wanted to live for other people… My life doesn't mean anything anymore the only thing I can do is help other people."

- "I didn't have a plan in my mind. I felt like I had to do this. I felt like I was on a mission . . . Maybe I told myself to have faith and just see where this goes and I had been thinking about for this for a while because of Luigi Mangione. I have seen the response to that and that situation . . . It was not an everyday thing and it extremely shook up everything. I pushed that away because I was thinking like that is so stupid, that accomplishes nothing, that poor kid just threw his life away for like a minute of vengeance. Vengeance is bullshit, no one feels good about that. I cannot see an average, ordinary person hurting someone else and feeling good about it and I know that's extremely naive, especially how he did it. It's some guy he never met before, he shot him in the back of the head- you can't feel proud about that. He's probably questioning his humanity every single day. But as time goes on and as time went on, I started to understand things differently in my own personal situation, not regarding Luigi, regarding mainly the foremost thing is time—the feeling of running out of time, but of holy shit it's me . . . I don't think I'm the Messiah or anything . . .  It's fate, it's destiny, it's whatever you want to call it."

- "So when you ask me what my plans were today, I really did not have any. For a while I've been thinking about doing everything I can to live for others… I just want to help and to take care of my friends before myself. I don't have the money to flee the country... I have been talking to my friends very recently about 'hey I really believe it's time to get out of the country and everything'. The thought of violence didn't occur to me until fairly recently and the thought of 'Holy shit it's me, it's my role unfortunately' not that there is a role and then it's me it's that I have a role and unfortunately it's violence. That's very important, it's the other way around."

The Defendant started planning a trip to Washington, D.C. one month ago, which included taking steps to mask any detection of the Defendant's true intention. The Defendant then assembled what the Defendant believed to be two capable Molotov cocktails and spent over an hour surveilling the grounds of the U.S. Capitol for how to carry out a plan to kill the nominee for Secretary of the Treasury. The nature and circumstances of these offenses weigh heavily in favor of detention.

### B. **The Weight of the Evidence**

The weight of the evidence weighs heavily in favor of pretrial detention.   As discussed at length in an opinion by then Chief Judge Howell, the "weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." *United States v. Michael Blackson*, No. 23-CR-25 (BAH), ECF No. 18 at 20 (D.D.C. Feb. 6, 2023).   This

is a "common-sense consideration," as "if the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *Id*.

Here, the evidence against the Defendant is strong. First, surveillance footage captures the Defendant arriving on the grounds of the U.S. Capitol at 1:57 PM that day and then walking around and surveilling the grounds for over an hour. Second, numerous witnesses observed the Defendant on the U.S. Capitol grounds, including the search of the Defendant. Officers identified the Defendant by the Defendant's own statements and a driver's license. Third, the government will present physical evidence found on the Defendant's person at trial, including: two 50 milliliter bottles of Absolut brand vodka with a grey cloth affixed to the top of each; a green BIC brand lighter; and a pocket knife. Additional physical evidence was recovered from the Defendant's car: an atlas; a 750 milliliter bottle of Smirnoff 100 proof vodka; and a grey sweatshirt with cloth cut from the sleeves (which was consistent with the cloth affixed to the Absolut brand vodka bottles found on the Defendant's person).

Additionally, the government will also introduce various statements by the Defendant, which were recorded on video. Notably, those statements include the following: "I've got a knife in my pocket, and Molotovs in my jacket" and "I was going to kill Scott Bessent."

Because the weight of the evidence is strong, it demonstrates that the Defendant is a danger to the community and strongly weighs in favor of detention.

### C.  **History and Characteristics**

The third factor, the history and characteristics of the person, also weighs in favor of detention.  The Defendant's conduct demonstrates an escalation in criminal behavior. As stated

during the custodial interview, the Defendant bought an atlas about a month ago and started to formulate a plan. Once the Defendant started driving, the Defendant "was making all of these plans in my head of what I could do", including:

- "I was planning on burning down [a Washington, D.C.-based think tank], which is near the White House. I was planning on getting there, asking and pretending . . . I was going to go there under the guise of I applied for an internship . . . I was going to go to the [think tank], tell them what they wanted to hear, and basically say that I was, 'oh I was emailing with [Individual-1] for a while, oh it must have been a scam, oh that's so unfortunate' and introduce myself . . . I was just thinking of ways to meet [Individual-1], so I could kill [Individual-1] with . . . I was going to just slit [Individual-1]'s throat because it was for revenge . . . I was going to go and do that, and if not that I was planning on burning down the building."

- "I was making all of these plans in my head of what I could do. If all else fails, I was going to slit my wrists on the White House steps. Just because that's all you can do if you can't hurt anyone else and you're out of options and you're out of time and you need to have an outlet and you need to show people how serious it is and you need to make one big dramatic fucking thing."

- "So, that's what I was going to do. I was gonna hurt big players. I really had such faith, that I was expecting to bump into someone who I would recognize and go for it. I was thinking, Trump's in LA right now for the fires, maybe I'll catch him on the way back, ram my car into him and just drive my knife into him and then just die in the process."

- "My thoughts and you know whatever, super incriminating stuff, SCOTUS, the Senate, running into Trump, and also like if all else were to fail, I could stake it out and just kind of like stay there like in the area and figure out what I wanted to do, whether it took days or weeks because I was kind of stuck there at that point."

But the Defendant did not merely *think* about a plan to kill the nominee; rather, the Defendant took multiple significant steps over a month-long period towards carrying out such a plan. The Defendant travelled overnight across multiple states, purposefully taking steps to conceal their movements from law enforcement. The Defendant arrived at the U.S. Capitol with what the Defendant believed to be two functioning Molotov cocktails and a knife. The Defendant then spent over an hour walking the grounds and surveilling the area. Upon arriving in D.C., the Defendant "realized all the buildings were giant and brick and surrounded by military and police." But, the

Defendant accepted that carrying out the plan would put the Defendant in grave danger and expressed acceptance and content with the possibility of suicide by cop. The Defendant also accepted that the Defendant would have to kill, at least, three U.S. Capitol Police Officers to get to the nominee.

As mentioned above, the Defendant described a diagnosis of a terminal illness and "wanted to do something before I go." Defendant's statements during the custodial interview reflect a recklessness that demonstrates that no condition or combination of conditions would be sufficient to assure the safety of the community. For example, the Defendant told officers, "That's why I feel so okay with telling everyone everything because not only am I going to be either incarcerated or incinerated within weeks or months, doesn't matter so I might as well tell you everything that I tell the lawyers because it doesn't matter and I'm not afraid." As another example, the Defendant specifically mentioned being influenced by Luigi Mangione, the individual charged with the murder of United Health Group CEO Brian Thompson. The Defendant described a call to violence as "fate" or "destiny." Those statements, coupled with the Defendant's perception that they have only a few months to live, demonstrate that the Defendant is a risk to the community if released.

Defendant now argues that all of the criminal conduct here was merely the product of a temporary mental state and a "cry for help or an unorganized act of protest." However, the Defendant does not proffer any mental health treatment, diagnosis, medication, or plan that has been developed or effective in the time since the charged offense. Indeed, other than a conclusory reference to receiving "mental health counseling and medical treatment" at the Correctional Treatment Facility, the Defendant does not provide any specific argument, let alone factual basis by which the Court could accept that bare assertion that the Defendant's "state of mind has improved significantly." (ECF No. 18 at 3). And while the Defendant includes a cursory condition

of "Mental health evaluation/counseling/treatment" in the proposed release conditions, there is no indication that there is any specific plan for obtaining treatment or coordinating and continuing on any treatment plan after release.

While the Defendant has proposed a conditional release plan involving her parents housing and monitoring the Defendant, such a plan would not be sufficient to ensure that safety of the community. Here, however, the Defendant has expressed a desire to harm, and kill, numerous individuals, and took significant steps towards carrying out that intent with regards to the nominee.

### D.  Danger to the Community

The fourth factor, the nature and seriousness of the danger to any person or the community posed by the Defendant's release, also weighs in favor of detention.   The charged offense involves the Defendant's planned assassination of a nominee for head of an Executive Branch agency using an incendiary device and demonstrates little regard for the safety of the employees at the U.S. Capitol.   In regards to the Defendant's intention, plan, and action to kill the nominee, Congress determined that such an offense carries with it a rebuttable presumption in favor of detention.   *See* 18 U.S.C. § 3142(e)(3)(C).   Once a rebuttable presumption has been triggered, the presumption operates at a minimum to impose a burden of production on the defendant to offer some credible evidence to the contrary. *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985).   And even if that happens, the presumption does not disappear entirely.   *See United States v. Lee*, 195 F. Supp. 3d 120, 125 (D.D.C. 2016) (quoting *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) ("The presumption remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial . . . To rebut the presumption, therefore, a defendant should "present all the special features of his case" that take it "outside the congressional paradigm")).

The Defendant traveled from Massachusetts to Washington, D.C. to kill the then-nominee for the Secretary of the Treasury Department. The Defendant took steps to avoid detection of such plan or actions.   The Defendant created what they believed were two Molotov cocktails, and specifically told the Defendant's belief that "it works."   The Defendant then took these Molotov cocktails and a knife to the U.S. Capitol grounds and surveyed the grounds for an hour. While the eventually surrendered to the police, the Defendant's statements afterwards demonstrate repeated, committed, and recurring desires and plans to harm individuals in Washington, D.C. with no concern for the consequences. This pattern raises serious concerns that the Defendant may once again attempt to engage in criminal activity because the Defendant does not approve of the current administration.

## Conclusion

For all of the foregoing reasons, there are no conditions that can assure the safety of the community if the Defendant was released and the Defendant should be detained pending trial.


JEANINE FERRIS PIRRO
United States Attorney


By:    /s/ *Brendan M. Horan*
       BRENDAN M. HORAN
       Special Assistant United States Attorney
       N.Y. Bar No. 5302294
       United States Attorney's Office
       601 D Street NW
       Washington, DC 20579
       (202) 730-6871
       Brendan.Horan@usdoj.gov